IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENDALL HUDSON, | : | Civil No. 3:15-cv-1282 |
| | : | |
| Plaintiff, | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| CARBERRY, *et al.*, | : | |
| | : | |
| Defendants | : | |
| | : | |

## MEMORANDUM

### I.    Background

Plaintiff Kendall Hudson ("Hudson"), an inmate who, at all relevant times, was

confined at the State Correctional Institution, in Camp Hill, Pennsylvania, initiated the

instant action pursuant to 42 U.S.C. § 1983. (Doc. 1). The matter is proceeding *via* an

amended complaint. (Doc. 22). Named as Defendants are Correctional Officers Carberry,

Moeller, Collins, Killeen, Reeder, Kuzar, and Cleaver, Hearing Examiners Kot and Wilson,

Unit Manger Digby, and Superintendent Harry. (*Id.* at pp. 2-3).

Presently pending before the Court is Defendants' motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56. (Doc. 68). The motion is ripe for resolution

and, for the reasons set forth below, the Court will grant the motion for summary judgment.

### II.    Summary Judgment Standard of Review

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving

party must offer specific facts contradicting those averred by the movant to establish a

genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S.

at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P.

56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court

need consider only the cited materials, but it may consider other materials in the record."

FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the

non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am.,*

*Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no genuine issue of
> material fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III.   Statement of Undisputed Facts[1]

---

[1]   Hudson filed a statement of material facts (Doc. 74), however his statement of material facts
fails to comply with Local Rule 56.1 which requires a party opposing a motion for summary judgment to
"include a separate, short and concise [responsive] statement of the material facts, responding to the
numbered paragraphs set forth in" the movant's fact statement. *See* Local Rule 56.1. Hudson's
responsive fact statement (Doc. 74) contains thirty-two paragraphs, and fails to correspond to the thirty-
seven paragraph concise statement of material facts filed by Defendants (Doc. 69). The averments of
Hudson's responsive fact statements are entirely independent of those in Defendants' filing, and the
numbered paragraphs of Hudson's submission do not correlate in any meaningful way to the paragraphs in
Defendants' statement. In sum, Hudson's document does not comply with Local Rule 56.1's requirement
of parity between the two filings. Therefore, as authorized by Local Rule 56. 1, the Court will admit as
uncontroverted the statement of facts submitted by Defendants. *See* Local Rule 56.1 ("All material facts
set forth in the statement required to be served by the moving party will be deemed to be admitted unless

3

Hudson was housed at SCI-Camp Hill from April 17, 2009 through February 11, 2016. (Doc. 69, Defendants' Statement of Material Facts, ¶¶ 1, 21; Doc. 74, Plaintiff's Statement of Material Facts, ¶ 1).

On April 20, 2009, Hudson received a copy of the Inmate Handbook and Administrative Directives. (Doc. 69 ¶ 5).

During the relevant time period of September 2014 through February 2015, Hudson did not appeal any grievances to final review. (Doc. 69 ¶ 22). Hudson filed five grievances related to the allegations in the amended complaint, namely, grievance numbers 531439, 533620, 544814, 546972, and 550534. (Doc. 69 ¶ 23). Hudson did not appeal any of these five grievances to final review. (Doc. 69 ¶ 23).

On October 12, 2014, Hudson filed grievance number 531439 regarding the destruction of his cell and confiscation of his materials on September 24, 2014. (Doc. 69 ¶ 26). The grievance does not identify any individuals by name. (Doc. 69 ¶ 26; Doc. 70-1, Declaration of Deborah Alvord ("Alvord Decl.") ¶ 17; Doc. 70-1, Ex. 1). Hudson's initial review was rejected because he failed to attach a "property sheet." (Doc. 69 ¶ 26; Alvord Decl. ¶ 17). Hudson never fixed this deficiency, and he never re-filed the grievance. (Doc. 69 ¶ 26; Alvord Decl. ¶ 17). Instead, Hudson appealed the rejection of grievance number

---

controverted by the statement required to be served by the opposing party."). To the extent that Hudson's fact statements tangentially relate to Defendants' fact statements, the Court cites to Hudson's statement of facts.

531439 to the Superintendent. (Doc. 69 ¶ 26). On appeal, the Superintendent upheld the Grievance Officer's rejection. (Doc. 69 ¶ 26). Hudson failed to appeal the decision of the Superintendent to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (Doc. 69 ¶ 26).

On October 26, 2014, Hudson filed grievance number 533620 regarding the living conditions of his cell in the Restricted Housing Unit ("RHU"). (Doc. 69 ¶ 24; Alvord Decl. ¶ 15; Doc. 70-1, Ex. 2). On November 19, 2014, the Facility Grievance Officer denied grievance number 533620. (Doc. 69 ¶ 24; Alvord, Ex. 2). Hudson failed to appeal the Facility Grievance Officer's denial of grievance number 533620. (Doc. 69 ¶ 24).

On December 21, 2014, Hudson filed grievance number 546972 alleging problems with Officers Reeder and Davy, denial of his food tray on December 3, 2014, and tampering with his food tray on December 5, 2014. (Doc. 69 ¶ 25; Alvord, Ex. 4). On January 17, 2015, the Facility Grievance Officer denied grievance number 546972. (Doc. 69 ¶ 25; Alvord, Ex. 4). Hudson failed to appeal grievance number 546972 after receiving the Initial Review Response rejecting the grievance. (Doc. 69 ¶ 25).

On December 21, 2014, Hudson filed grievance number 544814 complaining that he was denied yard for a month. (Doc. 69 ¶ 27; Alvord, Ex. 3). Hudson does not identify any individuals by name in this grievance. (Doc. 69 ¶ 27). The Facility Grievance Officer issued an Initial Review Response and denied grievance number 544814. (Doc. 69 ¶ 27). Hudson

5

appealed the rejection of grievance number 544814 to the Superintendent. (Doc. 69 ¶ 27). On appeal, the Superintendent upheld the Grievance Officer's rejection. (Doc. 69 ¶ 27). Hudson failed to appeal the decision of the Superintendent to the SOIGA. (Doc. 69 ¶ 27).

On January 20, 2015, Hudson filed grievance number 550534 regarding an interaction with Defendant Killeen on January 20, 2015, wherein Defendant Killeen purportedly trashed Hudson's cell and denied him yard without cause. (Doc. 69 ¶ 28; Alvord, Ex. 5). The Grievance Officer denied this grievance. (Doc. 69 ¶ 28). Hudson appealed the rejection of grievance number 544814 to the Superintendent. (Doc. 69 ¶ 28). On appeal, the Superintendent upheld the Grievance Officer's rejection. (Doc. 69 ¶ 28). Hudson failed to appeal the decision of the Superintendent to the SOIGA. (Doc. 69 ¶ 28).

The DOC has an appeal process through which an inmate can appeal a finding of guilt at a misconduct hearing. (Doc. 69 ¶ 29). Pursuant to Administrative Directive 801 ("DC-ADM 801"), if a misconduct is issued to an inmate, a Hearing Examiner will hold a misconduct hearing. (Doc. 69 ¶ 30; Doc. 74 ¶ 10). If the inmate is found guilty of a misconduct charge, he may appeal the decision to the Program Review Committee ("PRC") within fifteen calendar days of the hearing. (Doc. 69 ¶ 31). If the inmate is dissatisfied with the PRC's response, he may appeal to the Superintendent of the facility within seven calendar days of receipt of the written PRC decision. (Doc. 69 ¶ 32). The inmate may then file a further appeal to the Office of the Chief Hearing Examiner within seven calendar days

6

of receipt of the Superintendent's decision. (Doc. 69 ¶ 33).

On September 25, 2014, Hudson was issued misconduct number B739353, charging him with possession or use of a dangerous or controlled substance, possession of contraband, and failure to report the presence of contraband, in connection with a search of his cell that turned up lollipops. (Doc. 69 ¶ 36; Alvord, Ex. 6; Doc. 74 ¶ 2). The lollipops were drug tested using a NIK test kit, and the NIK test indicated the presence of narcotics. (See Alvord, Ex. 6). Hudson was given written notice of these charges, a chance to respond in writing, and a hearing was subsequently held. (Doc. 69 ¶ 36; Doc. 70, Ex. E, Declaration of Joseph Dupont ("Dupont Decl."), Ex. 2; Alvord, Ex. 6). Hearing Examiner Kot found that the evidence supported all three offenses, and ultimately found Hudson guilty of the charges, and sanctioned him with 270 days in disciplinary custody. (Doc. 69 ¶ 36; Alvord Decl. ¶ 25; Alvord, Ex. 6; Doc. 74 ¶ 9). Hudson filed an appeal to the Program Review Committee. (Doc. 70, Dupont, Ex. 2). On appeal, the Program Review Committee upheld the decision of the Hearing Examiner, and found that there was no evidence of any action taken that was contrary to DOC policy or procedures, the sanction imposed was well within the established guidelines, and the evidence relied upon by the Hearing Examiner was sufficient to support a finding of guilt. (Id.). Hudson then appealed to the Superintendent, who upheld the decision of the Hearing Examiner. (Id.). Hudson appealed the Superintendent's decision to the Chief Hearing Examiner. (Id.). On final review, the

7

Chief Hearing Examiner found no error in the Hearing Examiner's decision, and upheld the decisions of the Program Review Committee and the Superintendent. (*Id.*). Hudson fully availed himself of his appeal rights with respect to this misconduct. (Doc. 69 ¶ 36; Dupont Decl. ¶ 10).

On February 14, 2015, Hudson was issued misconduct number B742165, charging him with threatening an employee or their family with bodily harm and refusing to obey an order, offense numbers 15 and 35. (Doc. 69 ¶ 35; Alvord, Ex. 8). The Hearing Examiner dismissed offense 15, and Hudson pled guilty to offense 35. (*Id.*). Hudson was sanctioned to thirty days in disciplinary custody. (*Id.*). Hudson did not file any appeals with respect to this misconduct. (Doc. 69 ¶ 35; Alvord Decl. ¶ 27; Dupont Decl. ¶ 9).

Also on February 14, 2015, Hudson was issued misconduct number B742167, charging him with possession or use of a dangerous or controlled substance, and possession of contraband, in connection with a brown leafy substance that was found in his cell. (Doc. 69 ¶ 37; Alvord, Ex. 6; Doc, 74 ¶ 13). Security officers tested the substance, and it tested positive for the drug "K2." (Alvord, Ex. 7). Hudson was given written notice of the charges, a chance to respond in writing, and a hearing was conducted. (Doc. 69 ¶ 37; Dupont, Ex. 3; Alvord, Ex. 7; Doc. 74 ¶ 22). The Hearing Examiner found that the evidence supported both offenses, and sentenced Hudson to ninety days in disciplinary custody. (Doc. 69 ¶ 37; Alvord Decl. ¶ 26; Doc. 74 ¶¶ 23-24). Hudson filed an appeal to the Program

8

Review Committee. (Doc. 70, Dupont, Ex. 3). On appeal, the Program Review Committee

upheld the decision of the Hearing Examiner, and found that there was no evidence of any

action taken that was contrary to DOC policy or procedures, the sanction imposed was well

within the established guidelines, and the evidence relied upon by the Hearing Examiner

was sufficient to support a finding of guilt. (*Id.*). Hudson then appealed to the

Superintendent, who upheld the decision of the Hearing Examiner. (*Id.*). Hudson appealed

the Superintendent's decision to the Chief Hearing Examiner. (*Id.*). On final review, the

Chief Hearing Examiner found no error in the Hearing Examiner's decision, and upheld the

decisions of the Program Review Committee and the Superintendent. (*Id.*). Hudson fully

availed himself of his appeal rights with respect to this misconduct. (Doc. 69 ¶ 37; Doc. 74

¶ 25).

## IV.  Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a cause of

action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute

provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for
> redress. . . .

9

*Id.; see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## A.    Exhaustion of Administrative Review

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action. *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). The exhaustion requirement is mandatory, *see Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth*, 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Courts have also imposed a procedural default component on the exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. *Spruill v. Gillis*, 372 F.3d

10

218 (3d Cir. 2004). Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court. *See Spruill*, 372 F.3d 218. An "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006). Thus, the PLRA mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Id.* at 92.

The Pennsylvania Department of Corrections has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement. *See* 37 PA. CODE § 93.9(a); PA. DEP'T OF CORR., No. DC-ADM 804; *see also* Doc. 69 ¶¶ 2, 6. After an attempt to resolve any problems informally, an inmate may submit a written grievance to the Facility's Grievance Coordinator for initial review. (Doc. 69 ¶ 7). This must occur within fifteen days after the events upon which the claims are based. (Doc. 69 ¶ 11). Within fifteen days of an adverse decision by the Grievance Coordinator, an inmate may then appeal to the Superintendent of the institution. (Doc. 69 ¶ 13). Thereafter, within fifteen days of an adverse decision by the Superintendent, an inmate may file a final appeal to the Secretary's Office of Inmate Grievances and Appeals. (Doc. 69 ¶ 16). *See Booth v. Churner*, 206 F.3d 289, 293 n. 2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process). An appeal to final review cannot be completed unless an inmate complies

with all established procedures. An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue. See Booth, 206 F.3d at 293 n. 2; Ingram v. SCI Camp Hill, 448 F. App'x 275, 279 (3d Cir. 2011).

As stated supra, the amended complaint references grievance numbers 531439, 533620, 544814, 546972, and 550534. (See Doc. 22). The records maintained by the Department of Corrections confirm that Hudson did not appeal any of these grievances to final review. (Doc. 69 ¶¶ 22-28; Alvord Decl. ¶¶ 13-20). Defendants thus argue that Hudson's grievances were not exhausted, and all claims raised in connection therewith fail as a matter of law. (Doc. 71, pp. 10-15).

A declaration under penalty of perjury submitted by Deborah Alvord, Corrections Superintendent's Assistant, states that based on a review of the DOC's Automated Inmate Grievance Tracking System, Hudson failed to appeal any of the five relevant grievances to final review. (Doc. 70-1, Alvord Decl. ¶¶ 14-20). Hudson does not dispute this fact. (Doc. 72, pp. 8-11; Doc. 81). Accompanying Alvord's declaration are copies of the pertinent institutional administrative remedy records. (Doc. 70-1, Alvord Exhibits).

On October 12, 2014, Hudson filed grievance number 531439, regarding the destruction of his cell and confiscation of his materials on September 24, 2014. (Alvord, Ex. 1). Hudson does not identify any individuals by name in this grievance. (Doc. 69 ¶ 26;

12

Alvord, Ex. 1). Hudson's initial review was rejected because he failed to attach a "property sheet." (*Id.*). Rather than fix this deficiency, Hudson filed an appeal to the Superintendent. (*Id.*). On appeal, the Superintendent upheld the rejection of the grievance and denied Hudson's appeal. (*Id.*). The uncontroverted evidence establishes that Hudson failed to appeal the decision of the Superintendent to the SOIGA. (Doc. 69 ¶ 26).

On October 26, 2014, Hudson filed grievance number 533620, regarding the living conditions of his cell in the RHU. (Doc. 69 ¶ 24; Alvord, Ex. 2). On November 19, 2014, the Facility Grievance Officer denied grievance number 533620. (Doc. 69 ¶ 24; Alvord, Ex. 2). The uncontroverted evidence reflects that Hudson failed to file any appeals with respect to grievance number 533620. (Doc. 69 ¶ 24).

On December 21, 2014, Hudson filed grievance number 546972 alleging problems with Officers Reeder and Davy, denial of his food tray on December 3, 2014, and tampering of his food tray on December 5, 2014. (Doc. 69 ¶ 25; Alvord, Ex. 4). On January 17, 2015, the Facility Grievance Officer denied grievance number 546972. (Doc. 69 ¶ 25; Alvord, Ex. 4). The uncontroverted evidence establishes that Hudson failed to file any appeals of grievance number 546972. (Doc. 69 ¶ 25).

On December 21, 2014, Hudson filed grievance number 544814 alleging that he was denied yard for one month. (Doc. 69 ¶ 27; Alvord, Ex. 3). Hudson does not identify any individuals by name in this grievance. (*Id.*). On January 10, 2015, the Facility Grievance

13

Officer denied grievance number 544814. (*Id.*). Hudson appealed the decision of the Grievance Officer rejecting grievance number 544814 to the Superintendent. (*Id.*). On March 24, 2015, the Superintendent upheld the denial of grievance number 544814, and denied Hudson's appeal. (*Id.*). The uncontroverted evidence establishes that Hudson failed to appeal the decision of the Superintendent to the SOIGA. (*Id.*).

On January 20, 2015, Hudson filed grievance number 550534 regarding an interaction with Defendant Killeen on January 20, 2015, wherein Defendant Killeen purportedly trashed Hudson's cell and denied him yard without cause. (Doc. 69 ¶ 28; Alvord, Ex. 5). On February 28, 2015, the Facility Grievance Officer denied grievance number 550534. (*Id.*). Hudson appealed the decision of the Grievance Officer rejecting grievance number 550534 to the Superintendent. (*Id.*). On April 20, 2015, the Superintendent upheld the denial of grievance number 550534, and denied Hudson's appeal. (*Id.*). Hudson failed to appeal the decision of the Superintendent to the SOIGA. (*Id.*).

In his brief in opposition to Defendants' motion for summary judgment, Hudson only attempts to excuse his failure to exhaust one of his grievances, namely, grievance number 550534. (Doc. 71, pp. 10-11; Doc. 81). In an attempt to excuse his failure to exhaust, Hudson asserts that he was thwarted from exhausting his administrative remedies due to the actions of Defendant Killeen. (*Id.*). Hudson states that Defendant Killeen retaliated

14

against him for filing the grievance by issuing false misconducts against him, and threatening and assaulting him. (Id.). Furthermore, Hudson admits that he failed to utilize DC-ADM 804 to exhaust this grievance. (Doc. 81, pp. 2, 9). Hudson concedes that "[a]lthough [he] failed to exhaust his remedies through the DC-ADM 804 Grievance Policy, [h]e did exhaust the same claims through the DC-ADM 801 Policy." (Doc. 81, p. 9). However, DC-ADM 801 covers inmate discipline, including the assessment of costs for medical care and losses caused by inmate misconduct, while DC-ADM 804 covers general grievances. In order to properly exhaust grievance number 550534, Hudson was required to comply with DC-ADM 804.

The Pennsylvania Department of Corrections has three different administrative remedy processes which collectively provide an inmate a route to challenge every aspect of confinement. See Fortune v. Bitner, 2006 WL 2796158, at *7 (M.D. Pa. Sep. 25, 2006). Those policies are: (1) the Inmate Grievance Policy, DC-ADM 804; (2) the Inmate Discipline Policy, DC-ADM 801; and (3) the Administrative Custody policy, DC-ADM 802. See PA. DEP'T OF CORR., Policies, https://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx (last visited December 10, 2018). The three programs address specific issues which may arise within the prison, and one administrative remedy may not be substituted for the other. Fortune, 2006 WL 2796158, at *7. An inmate who has received a misconduct citation, i.e. a violation of DOC rules and regulations with a resulting disciplinary measure, and seeks to

15

appeal that misconduct or allege a grievance in connection with the events surrounding that misconduct, must use DC-ADM 801. *See id.* DC-ADM 801. DC-ADM 802 is similar, but applies to inmates in administrative custody. *See id.* DC-ADM 802. DC-ADM 804 applies to all inmate grievances not connected with a misconduct citation. *See id.* DC-ADM 804.

Hudson admits that he did not utilize DC-ADM 804 to fully exhaust his claims in grievance number 550534, but instead utilized DC-ADM 801. Proper exhaustion "demands compliance with an agency's deadlines and other critical procedural rules." *Woodford,* 548 U.S. at 90-91. The record reflects that Hudson did not properly and fully comply with DC-ADM 804 with respect to grievance number 550534. Furthermore, Hudson's admission that he *did* exhaust his claims through DC-ADM 801 undermines any assertion that he was intimidated or deterred from fully exhausting his administrative remedies.

Regarding grievance numbers 531439, 533620, 544814, and 546972, Hudson failed to set forth any evidence or argument that he exhausted these grievances. In addition to the fact that Hudson failed to appeal these grievances to final review, the grievances also fail to identify Defendants Carberry, Moeller, Collins, Kot, Wilson, and Harry, in contravention of DC-ADM's express mandate that: "[t]he inmate shall identify [the] individuals directly involved in the event(s)." (Doc. 69 ¶ 10) (citing DC-ADM 804 § 1, Part A(12)(a)-(d), (13)). Thus, apart from failing to exhaust grievance numbers 531439, 533620, 544814, and 546972, Hudson has also procedurally defaulted his claims against these

16

Defendants.

Therefore, as a threshold matter, Hudson's claims fail on administrative exhaustion grounds. Beyond this threshold concern, there are separate, and independent, substantive flaws with Hudson's claims against the Defendants. These deficiencies are discussed below.

## B.    Retaliation Claim

Defendants assert that if the Court does not grant summary judgment in their favor on Hudson's retaliation claim for failure to exhaust, the retaliation claim nevertheless fails on the merits. (Doc. 76, pp. 20-22). Defendants argue that Hudson failed to show that the filing of grievances was a substantial or motivating factor in the decision to issue the misconducts. (*Id.*).

The First Amendment offers protection for a wide variety of expressive activities. *See* U.S. CONST. amend I. These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment. *See Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000). To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) that he was engaged in constitutionally protected activity; (2) that he suffered an "adverse action" by

government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001) (quoting *Allah*, 229 F.3d at 225).

Hudson vaguely asserts that Defendants retaliated against him for filing grievances by fabricating misconducts, threatening and assaulting him, and denying him access to the prison yard, which deterred him from exhausting his administrative remedies. (Doc. 72, pp. 8-11). A "prisoner's ability to file grievances and lawsuits against prison officials is a protected activity for purposes of a retaliation claim." *Wicker v. Shannon*, 2010 U.S. Dist. LEXIS 99777, *19-20 (M.D. Pa. 2010) (dismissing all but one retaliation claim), *citing Milhouse v. Carlson*, 652 F.2d 371, 373-74 (3d Cir. 1981). Thus, the first prong of *Rauser*, i.e., that the plaintiff be engaged in a constitutionally protected activity, has been satisfied.

Once it is determined that the inmate was engaged in protected conduct, he must demonstrate that he has suffered some adverse action at the hands of prison officials. *See Rauser*, 241 F.3d at 333 (citing *Allah*, 229 F.3d at 225). "To show an 'adverse action,' the plaintiff must demonstrate that defendants' actions were 'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'" *Allah v. Al-Hafeez*, 208 F. Supp. 2d 520, 535 (E.D. Pa. 2002) (quoting *Allah*, 229 F.3d at 225). Hudson asserts that he suffered adverse action in the form of receiving misconducts, threats, and assaults. Thus, Hudson has satisfied the second *Rauser* prong.

18

In analyzing the third element, the Court must determine whether there is a causal connection between the exercise of the constitutional right and the adverse action. The plaintiff must show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. This "motivation" factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred. *Tighe v. Wall*, 100 F.3d 41, 42 (5th Cir. 1996); *Goff v. Burton*, 91 F.3d 1188 (8th Cir. 1996); *Pride v. Peters*, 72 F.3d 132 (Table) (7th Cir. 1995). It is plaintiff's burden to prove that defendants were motivated by retaliation. *Hannon v. Speck*, No. 87-3212, 1988 WL 131367, at *4 (E.D. Pa. Dec. 6, 1988) ("In bringing a § 1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor . . . was as he alleged.") (internal quotes and citation omitted), *aff'd*, 888 F.2d 1380 (3d Cir. 1989) (Table). Where the prisoner seeks to establish this causal link based upon the temporal proximity between the protected conduct and the alleged retaliatory act, "the timing of the alleged retaliatory action must be unusually suggestive before a causal link will be inferred." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997); *Rauser*, 241 F.3d at 334; *see also Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (concluding that the temporal proximity, nearly six months, is not unduly suggestive and does not sufficiently establish any causal link). "The mere fact that an adverse action occurs after a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link

19

between the two events." *Royster v. Beard*, 2008 U.S. Dist. LEXIS 56764 (M.D. Pa. 2008) (citing *Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005)).

"Once the initial showing is made by the prisoner, the burden then shifts to the prison official to prove that the same decision would have been made absent the protected conduct for reasons reasonably related to a legitimate penological interest." *DeFranco v. Wolfe*, 387 F. App'x 147, 154-55 (3d Cir. 2010) (citing *Rauser*, 241 F.3d at 334). The "courts should afford deference to decisions made by prison officials." *Rauser*, 241 F.3d at 334.

Hudson first claims that prison officials retaliated against him by filing misconducts. "In general, 'most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence' because courts afford prison officials 'great deference' in the context of prison disciplinary proceedings." *Whitehead v. Wetzel*, No. 17-2637, 2017 WL 6492638, *5 (3d Cir. Dec. 19, 2017) (quoting *Watson v. Rozum*, 834 F.3d 417, 425 (3d Cir. 2016). Where the prisoner is found guilty of the charges in a purportedly retaliatory misconduct report after a disciplinary hearing, the finding of guilt is considered strong evidence that the misconduct report was issued for a legitimate penological reason. *See Nifas v. Beard*, 374 F. App'x 241, 244 (3d Cir. 2010) (not precedential); *Romansky v. Stickman*, 147 F. App'x 310, 312 (3d Cir. 2005) (not precedential). A finding of guilt on a misconduct charge, combined with "a meaningful written statement of the evidence relied on

and the reasons for the action taken," establishes a "quantum of evidence" of misconduct sufficient to warrant summary judgment. *Williams v. Folino*, 664 F. App'x 144, 148-49 (3d Cir. 2016) (not precedential) (quoting *Watson*, 834 F.3d at 426; *Dyson v. Kocik*, 689 F.2d 466, 467 (3d Cir. 1982)). Prison officials are entitled to summary judgment for disciplining a prisoner, even if their actions were motivated by animus, as long as the prisoner's offenses "were so clear and overt" such that there was no genuine issue of material fact that the officials' actions were reasonably related to legitimate penological interests. *Carter v. McGrady*, 292 F.3d 152, 158-59 (3d Cir. 2002).

In the instant action, the determinations of guilt were accompanied by written statements detailing the evidence that the Hearing Examiners relied on in reaching their conclusions. (Doc. 70-1, p. 37; Doc. 70-1, p. 42).

Hudson was charged in misconduct number B739353 with possession or use of a dangerous or controlled substance, possession of contraband, and failure to report the presence of contraband. (Doc. 70-1, p. 33, Misconduct Report B739353). The misconduct was issued after a correctional officer found three lollipops in Hudson's cell that tested positive for amphetamines. (*Id.*). The correctional officer confiscated the contraband, issued a written statement, provided photographs of the purported contraband, and provided the positive drug test results. (Doc. 70-1, pp. 33-35). As part of the investigation, Hudson issued a written statement of his version of the event, and testified at the

misconduct hearing. (Doc. 70-1, pp. 36-37). The Hearing Examiner found that the evidence supported all three offenses, found Hudson guilty of the charges, and sanctioned him to disciplinary custody. (Doc. 70-1, p. 37). On appeal, the Program Review Committee and the Superintendent upheld the decision of the Hearing Examiner. (Id.). On final review, the Chief Hearing Examiner found that the Hearing Examiner did not err in conducting the hearing, the Hearing Examiner specifically documented findings of fact based on the evidence, the procedures were in complete accordance with DC-ADM 801, and the sanction imposed was not disproportionate to the offense. (Doc. 70, Dupont, Ex. 2).

Hudson was next charged in misconduct number B742167 with possession or use of a dangerous or controlled substance, and possession of contraband. (Doc. 70-1, p. 40, Misconduct Report B742167). The misconduct was issued after a correctional officer found an unknown brown leaf-like substance hidden in Hudson's cell that tested positive for K2. (Id.). The correctional officer confiscated the contraband, issued a written statement, provided photographs of the purported contraband, and provided the positive drug test results. (Doc. 70-1, pp. 40, 43-44). During the investigation, Hudson issued a written statement of his version of the event, and stated that the confiscated item was tobacco. (Doc. 70-1, pp. 41-42). The Hearing Examiner found that the evidence supported both offenses, found Hudson guilty of the charges, and sanctioned him to disciplinary custody. (Doc. 70-1, p. 37). On appeal, the Program Review Committee and the Superintendent

upheld the decision of the Hearing Examiner. (*Id.*). On final review, the Chief Hearing

Examiner found that the Hearing Examiner did not err in conducting the hearing, the

Hearing Examiner specifically documented findings of fact based on the evidence, the

procedures were in complete accordance with DC-ADM 801, and the sanction was not

disproportionate to the offense. (Doc. 70, Dupont, Ex. 3).

The record reflects that the reasons for the hearing examiners' actions were

well-documented and reasonably related to a legitimate penological interest in deterring the

possession and use of drugs in prisons. *See, e.g., Overton v. Bazzetta*, 539 U.S. 126, 134

(2003). Based on the foregoing, the Court finds that Defendants have satisfied their burden

of presenting a "quantum of evidence" that Hudson committed the misconducts as charged.

*Williams*, 664 F. App'x at 148-49 (quoting *Watson*, 834 F.3d at 426). Consequently,

summary judgment will be granted in Defendants' favor with respect to this retaliation claim.

With respect to Hudson's claim that Defendant Killeen retaliated by threatening and

assaulting him, this claim also fails. First, Hudson's claim that he was "threatened" does not

satisfy part two of the *Rauser* test. "Verbal abuse or threats do not constitute the type of

adverse action sufficient to support a retaliation claim." *Alexander v. Forr*, 2006 U.S. Dist.

LEXIS 70002, *13 (M.D. Pa. 2006), *citing Bartelli v. Bleich*, 2005 U.S. Dist. LEXIS 43711, *7

(M.D. Pa. 2005) (stating, "assertions of verbal abuse do not constitute 'adverse action'

sufficient to support a 42 U.S.C. § 1983" claim); *see also Howard v. Bureau of Prisons*,

23

2008 U.S. Dist. LEXIS 7997, *42 (M.D. Pa. 2008) (holding that "a threat from a prison guard, alone, is not actionable retaliation"). Second, Hudson has failed to submit any affirmative evidence in support of his claim that he was subjected to assault in retaliation for filing grievances. During his deposition, Hudson testified that he never wrote down or documented the alleged assault, he never filed any grievances pertaining to the alleged assault, he did not sustain any injuries, and never went to the medical department for treatment. (Doc. 70-4, pp. 34-35). The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" and cannot survive Rule 56 scrutiny by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). Hudson failed to meet his burden with respect to this claim. Accordingly, Defendant Killeen will be awarded summary judgment on this claim.

Hudson also makes a vague allegation that Defendants retaliated against him by denying him access to the prison yard. (Doc. 22, p. 5). However, Hudson has adduced evidence indicating that he *did* receive yard during the relevant time. (Doc. 22, Ex. E). On December 21, 2014, Hudson filed grievance number 544814 alleging that he was denied yard for a month. (*Id.*). On initial review, the Facility Grievance Officer denied the grievance and found as follows:

In the grievance you made the allegation that you were denied yard for 1 month straight and you are seeking $50,000 for pain and suffering. Although

24

the grievance is dated 2012 and you were housed in general population on P block during the time frame, I reviewed your 17x housing report while you were being housed in the RHU during the 2014 calendar year. You received yard on 11-20-14, 11-21-14, 11-25-14, and 12-17-14. All other dates are annotated as refused and yard is not conducted on the weekend. In accordance with the RHU block rules, the inmate is responsible for verbally addressing the Officer during morning mainline by stating "yard." Failure to do so will be noted as a refusal. It does appear that you understand the rules to receive yard due to your participation in yard during the time in which you allege that you were denied the activity. Due to the aforementioned reasons this grievance is denied.

(Doc. 22, p. 30). Hudson appealed the denial of grievance number 544814 to the

Superintendent. (Doc. 22, p. 31). On appeal, the Superintendent upheld the Grievance

Officer's rejection, and found as follows:

You claim that while housed on D block you signed up for yard every day and you were denied every time. You also claim that the dates in the response are false and that you are getting really ill in the cell which has affected you mentally and physically. The relief you seek is to have the cameras checked to show you were not in yard on 11.20.14, 11.21.14, 11.25.14 and 12.17.1[4] and you want to know why you were denied yard and staff are getting away with it.

As previously stated by the grievance officer, yard is not conducted on weekends and a review of your 17X record reflects that you went to yard on the dates listed above and refused yard on the remaining dates. There is no evidence to support your claim that you were denied yard for a month.

Therefore, I uphold the initial response and your appeal and any requested relief is denied.

(Doc. 22, p. 31). Hudson did not appeal the Superintendent's decision to the SOIGA.

Hudson has failed to satisfy the "adverse action" element of this retaliation claim by failing to

adduce any evidence that Defendants ever precluded him from participating in yard activities. Consequently, Defendants are entitled to an entry of summary judgment based on Hudson's failure to establish adverse action with respect to this claim.

Based on the foregoing, even if Hudson had exhausted his administrative remedies with respect his retaliation claim, Defendants would still be entitled to an entry of summary judgment on the retaliation claim.

## C.    Due Process Claim

Hudson asserts that he was subjected to false misconduct charges, and that his due process rights were violated during institutional misconduct hearings which resulted in his improper placement in disciplinary custody. He claims that he was denied due process at the disciplinary hearings regarding misconduct numbers B739353, B742165, and B742167.

With respect to misconduct number B742165, Hudson pled guilty to one offense, admitting the charges against him, and the other offense was dismissed. (Doc. 70-1, pp. 46-47, Misconduct Report B742165). Despite referencing misconduct number B742165 in the amended complaint, Hudson advances no argument in relation to this misconduct. Furthermore, since there is no indication in the amended complaint that Hudson is challenging the voluntariness of his guilty plea, the conduct of the hearing need not be examined.

Regarding misconduct numbers B739353 and B742167, the fact that Defendants Kot

26

and Wilson found Hudson guilty at the misconduct hearings is not in itself a due process violation. The filing of a false misconduct report does not violate an inmate's due process rights. As stated in *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." However, the "Plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law." *Id.* Thus, where a prisoner is provided due process, no constitutional violation results from his being falsely accused of misconduct. *Makenson v. Luzerne Cnty. Corr. Facility*, Civ. No. 4-13-2204, 2014 WL 4187666, at *4 (Aug. 22, 2014); *Brown v. Hannah*, 850 F. Supp. 2d 471, 476 (M.D. Pa. 2012). The uncontroverted evidence establishes that Hudson had the opportunity to challenge and confront the alleged false misconduct reports. He was provided with advance written notice of the misconducts, an opportunity to respond, hearings before a Hearing Examiner, and he exercised his appeal rights with respect to the misconducts. (Doc. 69 ¶¶ 29-37; Dupont Decl. ¶¶ 10-11; Dupont, Exs. 2-3). *See Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) ("[S]o long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim."); *see also Thomas v. McCoy*, 467 F. App'x 94, 97 (3d Cir. 2012) (per curiam) ("Due process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the

27

allegedly false misconduct reports.").

The Fourteenth Amendment of the United States Constitution provides in pertinent part that: "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." U.S. CONST. amend. XIV. The Supreme Court has mandated a two-part analysis of a procedural due process claim: first, "whether the asserted individual interests are encompassed within the ... protection of 'life, liberty or property[,]'" and second, "if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'" *Ingraham v. Wright*, 430 U.S. 651, 672 (1977). If there is no protected liberty or property interest, it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred.

In *Sandin v. Conner*, 515 U.S. 472 (1995), the United States Supreme Court shifted the focus of the liberty interest analysis from one "based on the language of a particular regulation" to "the nature of the deprivation" experienced by the prisoner. *Id.* at 481. The Court reasoned, *inter alia*, that "[d]iscipline by prison officials in response to a wide range of misconduct" is expected as part of an inmate's sentence. *Id.* at 485. Accordingly, the Court, focusing on the nature of the punishment instead of on the words of any regulation, held that the procedural protections in *Wolff v. McDonnell*, 418 U.S. 539 (1974)[2], were

---

[2]     In *Wolff*, the Supreme Court recognized that "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). However, the Court set forth five requirements of due process in a prison disciplinary proceeding: (1) the right to appear before an impartial decision-making

28

inapplicable because the "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin*, 515 U.S. at 486. For a prisoner, such a deprivation occurs when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

Here, because Hudson did not suffer a loss of good conduct time, the *Wolff* protections are inapplicable. Confinement in administrative or punitive segregation is insufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. *Sandin*, 515 U.S. at 486; *see Smith*, 293 F.3d at 645, 654 (seven (7) months of disciplinary confinement did not implicate liberty interest); *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997) (holding that "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed [. . .] by a court of law" and does not constitute a due process violation (quotation omitted)); *Young v. Beard*, 227 F. App'x 138 (3d Cir. 2007) (aggregate 980 days in disciplinary segregation did not violate the due process clause).

In *Diaz v. Canino*, 2012 WL 5352483 *3 (3d Cir. Oct. 31, 2012), the Third Circuit Court of Appeals reiterated that the sanctions resulting from prison disciplinary hearings do

---

body; (2) twenty-four hour advance written notice of the charges; (3) an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative . . . ; and, (5) a written decision by the fact finders as to the evidence relied upon and the rationale behind their disciplinary action. *Id.*

29

not affect a protected liberty interest unless the sanction imposes an atypical and significant hardship on the inmate. In *Diaz*, the Court of Appeals concluded that a 360 day term of disciplinary confinement did not implicate a protected liberty interest. The disciplinary sanctions at issue here, three separate and unrelated periods of disciplinary segregation, do not constitute "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483. Hence, Defendants are entitled to an entry of judgment on Hudson's due process claim.

## D. Personal Involvement Claim against Defendants Carberry, Harry, Digby, Kuzar, and

Defendants Carberry, Harry, Digby, Kuzar, and Cleaver argue that Hudson fails to state a claim against them because they lack personal involvement in the alleged wrongs. (Doc. 71, pp. 22-25). The Court finds merit in this argument.

Individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207-08; *see also Rizzo v. Goode*, 423 U.S. 362 (1976); *Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003). Such allegations, however, must

30

be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode*, 845 F.2d at 1208.

The only claims against Defendants Carberry and Harry are based upon a theory of *respondeat superior*. During Hudson's deposition, he acknowledged that the claims against Carberry and Harry are based on their supervisory roles. Hudson was asked: "Do you have any reason to believe that Carberry personally did this?" (Doc. 70-4, p. 21, Hudson Deposition, N.T. 74:115-16). Hudson responded, "No, Carberry just oversee[s] everything." (Doc. 70-4, p. 21, Hudson Deposition, N.T. 74:17). Hudson seems to assert that Defendant Carberry is liable for the officers' conduct because he was the Security Captain who authorized a cell search. This claim does not state a constitutional infraction, since prison officials are entitled to search inmate cells and prisoners have no constitutionally protected expectation of privacy in their prison cells. *See Hudson v. Palmer*, 468 U.S. 517, 529 (1984). Furthermore, there is no indication that Defendant Carberry participated in the search or acquiesced in the manner in which the cell search was conducted.

Regarding Defendant Harry, Hudson was asked: "Why are you suing Laurel Harry?" (Doc. 70-4, p. 37, Hudson Deposition, N.T. 140:15-16). In response, Hudson stated that

31

"[s]he oversees everything in the jail." (Doc. 70-4, p. 37, Hudson Deposition, N.T. 140:17).

Counsel further asked: "Are you claiming hat she personally was involved in any of these

incidents, though?" Hudson replied: "No, just that she wasn't present." (Doc. 70-4, p. 37,

Hudson Deposition, N.T. 140: 18-22). These claims are premised solely upon the

supervisory positions of Carberry and Harry. Based upon an application of the above

standards, the allegations against Defendants Carberry and Harry based on their

supervisory roles are insufficient to satisfy the personal involvement requirement standard

of Rode.

Hudson further claims that Defendants Digby and Kuzar denied grievances, and

Defendant Harry "answered some of the grievances, so she was aware of these incidents."

(Doc. 70-4, p. 37, Hudson Deposition, N.T. 140:21-22). These claims likewise fail. A state

prisoner's allegation that prison officials and administrators responded inappropriately, or

failed to respond to a prisoner's complaint or an official grievance, does not establish that

the officials and administrators were involved in the underlying allegedly unconstitutional

conduct. See Rode, 845 F.2d at 1207-08 (concluding that after-the-fact review of a

grievance is insufficient to demonstrate the actual knowledge necessary to establish

personal involvement); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006); see also

Croom v. Wagner, 2006 WL 2619794, at *4 (E.D. Pa. Sept. 11, 2006) (holding that neither

the filing of a grievance nor an appeal of a grievance is sufficient to impose knowledge of

32

any wrongdoing); *Ramos v. Pennsylvania Dept. of Corrections*, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (holding that the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement).

Defendants next argue that Cleaver's involvement in directing a substance test is insufficient to establish personal involvement. Hudson asserts, *inter alia*, that Defendant Cleaver violated his constitutional rights by ostensibly being aware that the confiscated substance was tobacco, but nevertheless directing Defendant Killeen to have the substance tested. (Doc. 22 ¶ 52). The evidence reflects that Defendant Cleaver witnessed the cell search that found the purported K2 substance and advised Defendant Killeen to contact security. (Doc. 73-4, p. 2; Doc. 73-8, p. 4). The evidence further reflects that Defendant Killeen confiscated the substance, placed it into evidence with the Security Office, and Defendant Moeller tested the substance. (Doc. 73-8, p. 5, Receipt for Property). The uncontroverted record reflects that Defendant Cleaver was not involved in testing the substance, but rather, advised Defendant Killeen to contact security. Hudson's opposition does not dispute Defendants' argument with respect to this claim. (*See* Doc. 72, pp. 15-17). Accordingly, because Hudson has failed to substantively respond to this argument, the Court finds that he has waived his opposition. *See D'Angio v. Borough of Nescopeck*, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999); *Griglak v. CTX Mortgage Co., LLC,* No. 09-5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) ("The failure to respond to a substantive argument

to dismiss a count, when a party otherwise files opposition, results in a waiver of that count"); *see also* L.R. 7.6.

Based on the foregoing, Defendants Carberry, Harry, Digby, Kuzar, and Cleaver are entitled to an entry of judgment in their favor based on their lack of personal involvement in the alleged constitutional violations.

## E.    Qualified Immunity

Defendants Kot, Wilson, Digby, Kuzar, and Cleaver invoke the defense of qualified immunity in their summary judgment motion. (Doc. 71, pp. 25-27). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp*, 669 F.3d at 159 (citing Pearson, 555 U.S. at 244). Although qualified immunity is

generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571 F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first). Because there are no genuine issues of fact as to whether a constitutional or federal right has been violated, Defendants' motion will be granted on this ground.

## V.    Conclusion

Based on the foregoing, Defendants' motion (Doc. 68) for summary will be granted. A separate Order shall issue.

Dated: December ___, 2018

Robert D. Mariani
United States District Judge